IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

SHIQUITA L. FRIESON,    *
                        *
    Plaintiff,          *
                        *
vs.                     *   CIVIL ACTION 06-00295-WS-B
                        *
MICHAEL J. ASTRUE,      *
Commissioner of Social Security,  *
                        *
    Defendant.          *

### REPORT AND RECOMMENDATION

Plaintiff Shiquita L. Frieson ("Plaintiff"), proceeding pro se, brings this action seeking judicial review of a final decision of the Commissioner of Social Security denying her claim for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 et seq., and 1381 et seq. Oral argument was held on April 24, 2007. Upon careful consideration of the administrative record, oral argument and the memoranda of the parties, it is hereby **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED.**

### I.   Procedural History

Plaintiff protectively filed applications for disability insurance benefits and supplemental security income on March 17, 2000, alleging that she has been disabled since February 21, 2000 due to cardiomyopathy, hypertension and asthma. (Tr. 21, 62-64, 368). The Social Security Agency determined that Plaintiff met Listing 4.08 (cardiomyopathy) effective February 21, 2000. (Id.) Thus, she was found disabled, and entitled to benefits. (Id.) Pursuant to the regulations, Plaintiff's health condition was reevaluated in 2003 for continued disability, and it was determined that her disability ceased in September 2003. (Id. at 23-45, 368-371). Consequently, on September 23,

2003, Plaintiff received initial notification of the cessation of benefits. (Id. at 25-28, 146-153). Plaintiff requested and was denied reconsideration of the cessation decision. (Id. at 29-35). Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 46). On June 22, 2005, ALJ William Ragland ("ALJ" or "ALJ Ragland") held an administrative hearing, and on December 16, 2005, issued an unfavorable decision. (Id. at 9-20, 372-383). He found that Plaintiff's disability ceased as of September 30, 2003, and that she retains the residual functional capacity ("RFC") to perform a full range of light work. (Id. at 20). On March 16, 2006, the Appeals Council denied Plaintiff's request for review; thus, the ALJ's decision became the final decision of the Commissioner in accordance with 20 C.F.R. § 404.981. (Id. at 4-7). The parties agree that this case is now ripe for judicial review and is properly before this Court pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## II.   Issues on Appeal

A.   Whether the ALJ erred by finding that Plaintiff had medical improvement such that her disability ceased in September 2003?

## III.   Factual Background

Plaintiff was born on September 8, 1975, and was 29 years old at the time of the administrative hearing. (Tr. 375). She has an 11th grade education, and past work experience ("PRW") as a custodian, cashier, instructor's aide and dietary aide. (Id. at 96, 101, 117-124, 376-377). At the June 2005 hearing, Plaintiff, proceeding pro se, reported that she last worked in 2000, that she was diagnosed with cardiomyopathy in 2000, and that she was unable to work because she suffered shortness of breath and swollen ankles, hands and feet, and tired easily. (Id. at 377, 379-382). Plaintiff also reported that she has asthma, hypertension, elevated blood pressure, left arm problems from a prior injury; and psychosis, and suffered a "really bad" nervous breakdown in 2002

or 2003 which resulted in her being diagnosed with schizophrenia and a bipolar disorder. (Id. at 379-380). According to Plaintiff, her mother helps her cook and care for her four children. (Id. at 381). Plaintiff indicated that she performs some household chores, reads the newspaper some, and drives every so often. (Id. at 381-382). Her reported medications have included Coreg, Primidone, Wellbutrin, Seroquel, Potassium, Lexapro, Lasix, Mysolin, Albuterol, Prozac, Altace, Tylenol PM and Vasotec. (Tr. 90, 100, 160, 162).

**IV.   Analysis**

    **A.   Standard of Review**

In reviewing claims brought under the Act, this Court's role is a limited one. The Court's review is limited to determining 1) whether the decision of the Secretary is supported by substantial evidence and 2) whether the correct legal standards were applied. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990).[1] A court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986). The Commissioner's findings of fact must be affirmed if they are based upon substantial evidence. Brown v. Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991); Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (holding substantial evidence is defined as "more than a scintilla but less than a preponderance" and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion[]"). In determining whether substantial evidence exists, a court must view the record as a whole, taking into account evidence favorable, as well as unfavorable, to the Commissioner's decision. Chester v. Bowen, 792 F. 2d 129, 131 (11th Cir. 1986); Short v. Apfel, 1999 U.S. DIST. LEXIS 10163 (S.D. Ala. 1999).

---

[1] This Court's review of the Commissioner's application of legal principles is plenary. Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).

## B.   Discussion

An individual who applies for Social Security disability benefits must prove her disability. 20 C.F.R. §§ 404.1512, 416.912. Disability is defined as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 404.1505(a), 416.905(a). The Social Security regulations provide a five-step sequential evaluation process for determining if a claimant has proven her disability. 20 C.F.R. §§ 404.1520, 416.920.[2]

After a claimant has been awarded disability benefits, the Commissioner is statutorily required to periodically review whether entitlement to receive benefits continues. 20 C.F.R. § 404.1594(a). When a claimant presents evidence of continuing disability, a presumption attaches that the disability continues, until proven otherwise. See, e.g., Williams v. Apfel, 73 F. Supp. 2d 1325, 1337 (M.D. Fla. 1999). Therefore, the burden is upon the Commissioner to present evidence

---

[2]The claimant must first prove that he or she has not engaged in substantial gainful activity. The second step requires the claimant to prove that he or she has a severe impairment or combination of impairments. If, at the third step, the claimant proves that the impairment or combination of impairments meets or equals a listed impairment, then the claimant is automatically found disabled regardless of age, education, or work experience. If the claimant cannot prevail at the third step, he or she must proceed to the fourth step where the claimant must prove an inability to perform their past relevant work. Jones v. Bowen, 810 F.2d 1001, 1005 (11th Cir. 1986). In evaluating whether the claimant has met this burden, the examiner must consider the following four factors: (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; (4) the claimant's age, education and work history. Id. at 1005. Once a claimant meets this burden, it becomes the Commissioner's burden to prove at the fifth step that the claimant is capable of engaging in another kind of substantial gainful employment which exists in significant numbers in the national economy, given the claimant's residual functional capacity, age, education, and work history. Sryock v. Heckler, 764 F.2d 834 (11th Cir. 1985). If the Commissioner can demonstrate that there are such jobs the claimant can perform, the claimant must prove inability to perform those jobs in order to be found disabled. Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999). See also Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987) (citing Francis v. Heckler, 749 F.2d 1562, 1564 (11th Cir. 1985)).

to support the decision to terminate disability income benefits or supplemental security income.[3] Id. In reviewing a decision to terminate benefits, the ALJ must compare the original medical evidence to the new medical evidence used to make a finding of medical improvement. Id. The comparison begins with the most recent favorable medical decision, that is, the latest final decision involving consideration of the medical evidence and the issue of whether claimant was disabled or continued to be disabled. Id. See also 20 C.F.R. §§ 404.1594(b)(7), 416.994(b)(1)(vii). Review of the medical signs, the claimant's statements of her symptoms and complaints, and laboratory findings are all necessary to determine whether medical improvement has occurred. See, e.g., Williams, 73 F. Supp. 2d at 1337-1338. See also 20 C.F.R. §§ 404.1594(b)(1), 416.994(b)(1)(i).

Medical improvement is defined as any decrease in the medical severity of the claimant's impairment(s) which was present at the time of the most recent favorable medical decision that the claimant was disabled or continued to be disabled. 20 C.F.R. §§ 404.1594(b)(1), 416.994(b)(1)(i). The medical improvement must be related to the claimant's ability to work, which means that along with the decrease in severity of the claimant's medical impairment, there has been an increase in the claimant's residual functional capacity to do basic work activities. 20 C.F.R. §§ 404.1594(b)(3), 419.994(b)(1)(iii). There must also be a showing that the claimant is able to engage in substantial gainful activity. 20 C.F.R. §§ 404.1594(b)(5), 419.994(b)(1)(v). The regulations state that when new evidence showing a change in signs, symptoms and laboratory findings establishes that both

---

[3] "[O]nce the claimant has introduced evidence that his or her condition remains essentially the same as it was at the time of the earlier determination, the claimant is entitled to the benefit of a presumption that his or her condition remains disabling . . . . The presumption of a continuing disability does not affect the ultimate burden of proof. It imposes on the [Commissioner] only the burden of going forward with evidence to rebut or meet the presumption . . . . Once the burden to come forward has shifted to the SSA, the [Commissioner] must present evidence that there has been sufficient improvement in the claimant's condition to allow the claimant to undertake gainful activity." Williams, 73 F. Supp 2d at 1337.

medical improvement has occurred and a claimant's functional capacity to perform basic work activities, or residual functional capacity, has increased, medical improvement which is related to your ability to work has thus occurred. 20 C.F.R. §§ 404.1594(b), 416.994(b).[4]

In a disability insurance benefits case, the regulations require the Commissioner to follow an eight-step[5] sequential evaluation process to determine whether a claimant has obtained medical improvement: 1) the claimant must not be engaged in "substantial gainful activity;" 2) it must be determined whether the claimant's severe impairment meets or equals the severity of a listed impairment – if the claimant's condition meets or equals the level of severity of a listed impairment, the claimant's disability continues; 3) if the severe impairment does not equal or meet the severity of a listed impairment, the examiner proceeds to the third step – an assessment of whether there has been medical improvement of the claimant's condition; 4) if there has been medical improvement, it must be determined if that improvement is related to the claimant's ability to do work, and if there has not been medical improvement, the examiner proceeds to the fifth step; 5) to determine whether any exceptions listed in 20 C.F.R.§ 404.1594(d) and (e) apply; 6) if there has been medical

---

[4] There are exceptions to the requirement of a finding of medical improvement, which may also result in the termination of disability benefits. 20 C.F.R. § 404.1594(d) and (e). Sub-section (d) refers to certain limited situations where disability has ended without medical improvement. Specifically, (1) where medical technological advances improve the claimant's ability to perform substantial gainful employment, (2) where the claimant has had vocational therapy which improves the ability to meet the vocational requirements of more jobs, (3) where the claimant should never have been considered disabled because new or improved medical diagnostic or evaluative techniques show that the claimant's impairment is not as disabling as it was once considered, and (4) where substantial evidence demonstrates that the prior decision was in error because (i) evidence was misread or an adjudicative standard, such as a Listing, was misapplied, (ii) where missing evidence later supplied supports a finding of not disabled, (iii) where new evidence relating to the prior determination refutes conclusions based upon the prior evidence, (iv) or the claimant is working. Sub-section (e) refers to a second group of exceptions which result in a decision without a determination of medical improvement or ability to engage in substantial gainful activity. These are circumstances of (1) fraud in obtaining benefits, (2) failure to cooperate, (3) inability to find the claimant, and (4) failure to follow prescribed treatments which would restore the claimant's ability to work. See also 20 C.F.R. § 416.994(b)(3) and (4).

[5] In cases wherein the plaintiff previously received supplemental security income benefits there is a seven-step process. 20 C.F.R. § 416.994(b)(5).

improvement shown to be related to a claimant's ability to do work or one of the first group of exceptions applies, it must then be determined whether all claimant's current impairments in combination are severe, and if severe, the examiner proceeds to the seventh step; 7) an assessment of the claimant's ability to do substantial gainful activity – i.e., an assessment of a claimant's RFC based on all current impairments and a consideration as to whether a claimant can still perform her PRW, and if the claimant is unable to perform PRW, the examiner proceeds to the eighth step; and 8) will determine whether, given her RFC, age, education and PRW, the claimant can perform other work. 20 C.F.R. § 404.1594(f)(1)-(8). See, e.g, Whetstone v. Barnhart, 263 F. Supp. 2d 1318, 1337-1338 (M.D. Ala. 2003); Chumbley v. Shalala, 1994 WL 774030, *2-3 (M.D. Ga. Nov. 22, 1994); Cagle v. Shalala, 1994 WL 465824, *3-6 (N.D. Ala. May 10, 1994).  This eight-step standard subsumes the substantial evidence analysis such that this Court must review the Secretary's final decision in terms of both the eight-step analysis and the substantial evidence standard. Whetstone, 263 F. Supp. 2d at 1321. "The appropriate inquiry is whether the Secretary's finding of improvement to the point of no disability is supported by substantial evidence." Id.

In case sub judice, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since she was found to be disabled. (Tr. 19-20). The ALJ found that while Plaintiff has the severe impairment of cardiomyopathy, it does not meet or equal the severity of a listed impairment. (Id.) The ALJ concluded that there had been medical improvement of Plaintiff's condition and that said improvement was related to her ability to work. (Id.) The ALJ determined that while Plaintiff's cardiomyopathy impairment is severe, she retains the RFC to perform light work but is unable to perform her past relevant work ("PRW"). (Id.) The ALJ then determined that due to Plaintiff's residual functional capacity ("RFC") for light work, age, education and work history, a finding of

not disabled was directed by Rule 202.17 of the Medical-Vocational Guidelines.[6] (Id.) Thus, the ALJ concluded that Plaintiff's disability ceased on September 30, 2003. (Id.)

The undersigned's review of the relevant medical evidence reveals that she was treated in the Emergency Room at the Mobile Infirmary Medical Center ("Infirmary") as follows (Tr. 169-222):

- February 10-11, 2000: Plaintiff reported epigastric and upper mid back discomfort and atypical chest pain. (Id. at 169-184, 216-222). Her heart exams revealed a normal S1 and S2, no audible murmur, no gallop and no rub. (Id.) She had atypical chest pain but no angina. (Id.) Her February 10th chest x-ray revealed cardiomegaly present with the cardiac to thoracic ratio of 17/29; and echocardiographic studies were scheduled for February 21st and she was instructed to follow-up with Cardiology and her primary care physician Dr. Carroll. (Id.)

- February 29, 2000: Plaintiff reported epigastric pain and discomfort; an upper abdominal sonogram/ultrasound was conducted. (Id. at 185-189).

- January 8, 2001: Plaintiff's chest x-ray was normal and the enlarged cardiac silhouette noted previously was no longer identified. (Tr. 215).

- August-September 2002: Plaintiff was hospitalized for paranoia/hearing voices. (Id. at 190-214). She was assessed with psychosis nos and a history of dilated cardiomyopathy, presumed peripartum (managed on beta blockers and ACE inhibitors). (Id.) A cardiology consultant recommended that she continue taking Coreg, Lasix and Casotec and obtain an echocardiogram. (Id.) Plaintiff denied any dizziness, chest pain, shortness of breath, numbness or weakness of her extremities. (Id.)

- August 19, 2002: Plaintiff's electrocardiogram revealed T inversions anteriorly (sinus bradycardia with a rate of 50 with T inversions in V2 and V3), which were less prominent than on prior electrocardiograms a year and a half earlier. (Id. at 211-213). Plaintiff denied pain or shortness of breath. (Tr. 211). She had a regular cardiovascular rate and rhythm without gallops or murmurs, and her chest x-ray was normal. (Id.)

---

[6]The undersigned notes that while the ALJ cited to the correct rule, Rule 202.17 in the body of his decision, he inadvertently cited to Rule 201.17 in his formal findings – a rule which is inapplicable to the present case as it concerns sedentary work and here, Plaintiff was found to retain the RFC for light work. (Tr. 20).

Plaintiff was treated at Franklin Primary Health Center, Inc. ("Franklin") from 2000 through 2003, during which time her history of dilated cardiomyopathy was noted. (Id. at 234-254). Her examinations revealed that her heart had decreased tones and no murmurs. (Id.)

Plaintiff was also treated by David M. Shaw, M.D. ("Dr. Shaw") of The Heart Group, from February 21, 2000 through November 18, 2003 (Id. at 308-342):

- 2000: Plaintiff had nine visits during 2000, and her echocardiogram revealed a left ventricle dilated with severe global decrease in LV systolic function. The records reflect an ejection fraction of **15-20%** was repeatedly noted. (Id. at 319-342). It was also noted that she had a history of gastroespohageal reflux, mild obesity, tobacco use, and a history of palpitation. (Tr. 319-342). An outpatient echo revealed significant cardiomyopathy, global in dysfunction. (Id.) She was assessed with cardiomyopathy of unknown etiology; obesity; tobacco abuse; and a history of gastroesophageal reflux disease. (Id.) Her treatment plan included decreasing Altace to 1.25 mg q.d., increasing her blood pressure, continuing her on Lasix, weight reduction, and discontinuing all tobacco products. (Id.) By October 2001, it was noted that Plaintiff had decreased shortness of breath, no chest pain, and that her exercise capacity and fatigue were markedly improved, although she reported occasional dizziness when taking both of her medications at same time. (Id. at 315). Her cardiac rate/rhythm was regular with distant heart tones, no gallop was appreciated and no murmur was appreciated. (Id.) There was trace edema bilaterally in her extremities. (Tr. 315). She was assessed with dilated cardiomyopathy, compensated on Coreg and Vasotec b.i.d. regimen; obesity, weight reduction as possible; hypertension in the past; and tobacco abuse in the past. (Id.)

- 2001: Plaintiff had three visits with Dr. Shaw in 2001. (Id. at 315-318). The records reflect that Plaintiff had dilated cardiomyopathy that had been pretty well compensated on ACE inhibitors and beta blocker, no chest pain, no significant shortness of breath, and no orthopnea or PND. (Id.) She did have intermittent lower extremity swelling; however, no acute distress was noted. (Id.) Her cardiac exam revealed a regular rate/rhythm with distant heart tones, no gallop was appreciated, she had a faint systolic murmur along right upper sternal border, and her extremities revealed trace edema. (Id.) She was assessed with an impacted wisdom tooth and dilated cardiomyopathy, compensated by increasing Coreg 25 mg twice a day. (Tr. 315-318). She was strongly encouraged to lose weight. (Id.) In June 2001, Plaintiff reported that she had done reasonably well since her last visit, that she was

        walking 5 laps on the track in the mornings, and that she had experienced one episode of shortness of breath due to exercising too late in the day with heat, but that otherwise she "feels overall okay." (Id. at 316). She was assessed with dilated cardiomyopathy, compensated on Coreg and Vasotec b.i.d. regimen; obesity, weight reduction as possible; hypertension in the past; tobacco abuse in the past. (Id. at 315-318).

- 2002: Plaintiff had one visit with Dr. Shaw in 2002. (Id. at 314). The records note that Plaintiff had a history of dilated cardiomyopathy, hypertension and mild lower extremity edema, and that since her last visit, she had felt good and has had no significant shortness of breath or chest pain. (Id.) Some dental problems were noted. (Tr. 314). Her exam revealed a regular cardiac rate and rhythm with distant heart tones, no gallop was appreciated, she had no murmur and her extremities revealed no edema. (Id.) She was assessed with dilated cardiomyopathy, recently compensated on Coreg and Vasotec; obesity, weight reduction with diet/exercise; hypertension; being a former smoker; and dental disease. (Id.)

- 2003: Plaintiff had five visits with Dr. Shaw in 2003. (Id. at 308-313). In February 2003, it was noted that Plaintiff missed her last 2 appointments, and that one missed appointment due to being hospitalized for psychosis. (Id. at 313). She reported no chest pain, but some shortness of breath which was attributed to her weight gain. (Id.) Her exam revealed a regular cardiac rate and rhythm with distant heart tones, no gallop was appreciated, she had no murmur and she had no edema in her extremities. (Tr. 308-313). In April 2003, she was assessed with dilated cardiomyopathy reasonably compensated; history of noncompliance; obesity, weight reduction; being a former smoker; and dental disease. (Id. at 312). An echocardiogram in September 2003 revealed an ejection fraction of **42%.** (Id. at 309). The records reveal that two months later, Plaintiff's left ventricular function had improved with an echocardiogram revealing an ejection fraction of **40-45%.** (Id. at 308). Plaintiff reported that she was feeling better, had more energy and had begun an exercise program. (Id.) Her cardiovascular exam revealed that she had a regular rate and rhythm without murmurs and no gallop. (Id.) She was assessed with dilated cardiomyopathy "with improvement recent assessment, on ACE inhibitor and beta blockers[;]" hypertension, well compensated; a history of noncompliance with compliance issues better addressed; obesity, and weight reduction through diet/exercise. (Tr. 308).

        On July 28, 2003, Michael A. Rihner, M.D. ("Dr. Rihner") completed a cardiovascular disability evaluation of Plaintiff, and concluded that she had a history of dilated cardiomyopathy, presumably nonischemic, the exact etiology of which was unclear; that her last documented ejection

fraction of June 2001 revealed **30-35%;** that her symptoms were most consistent with Class II New York Heart Association congestive heart failure. (Id. at 299). He noted that it might be helpful to have a more recent echocardiogram to evaluate the true left ventricular systolic function as she appeared to be on appropriate medical therapy. (Id.) Dr. Rihner found that clearly Plaintiff, if she does have depressed LV systolic function, has Class II symptoms, and would not be able to pursue vigorous physical labor, but may be able to do some limited form of work involving sedentary activities. (Id.)

On September 5, 2003, a State Agency physician completed a Physical Residual Functional Capacity Assessment on Plaintiff, and concluded that she can occasionally lift/carry 20 pounds; frequently lift/carry 10 pounds; stand/walk for 6 hours per 8 hour workday; sit for 6 hours per 8 hour workday; her push/pull abilities were unlimited; she had no postural, manipulative, visual or communicative limitations; and was only limited from avoiding concentrated exposure to extreme cold and heat. (Id. at 300-307). It was noted that she had an ejection fraction of **20-25%** in May 2000; that a September 2003 echocardiogram indicated apparently normal to mildly increased LV systolic with an ejection fraction of **40-45%** and no other significant abnormality; that in July 2003, her cardiovascular exam indicated her heart had a regular rhythm, her lungs were clear and her musculoskeletal exam was normal, Class II symptoms were noted; and that in July 2003, her treating physician concluded that her dilated cardiomyopathy had compensated. (Id. at 301-302).

Plaintiff was treated at the Mobile Mental Health Center ("MMHC") from November 21, 2000 through December 9, 2003. (Tr. 343-362). She was diagnosed with psychosis nos, depression nos and cardiomyopathy. (Id.) During her visits, Plaintiff denied self-injurious behavior and suicidal/homicidal thoughts. (Id.) Her memory was impaired and her thoughts were generally

within normal limits. (Id.) She was prescribed Seroquel and Wellbutrin. (Id.)

Plaintiff was evaluated by C.E. Smith, M.D. ("Dr. Smith") in September 2005, at the request of the Disability Office. (Id. at 363-367). Dr. Smith noted that Plaintiff had a brief psychiatric hospitalization in 2002, and that she had received treatment at MMHC for depression and psychosis NOS; however, she discontinued that treatment and reported that she had begun seeing Dr. Shepard Fleet instead. (Tr. 364). Dr. Smith found that Plaintiff showed no thinking disorder and that she gave no indication of hallucinations. (Id. at 363-365). She was euthymic, easy going in manner and her affect was adequate and appropriate. (Id.) He diagnosed Plaintiff with major depressive disorder, by history; and psychosis NOS, by history. (Id. at 365). He opined that both diagnoses were now in remission. (Id.)

> **1.    Whether the ALJ erred by finding that Plaintiff had medical improvement such that her disability ceased in September 2003?**

Plaintiff contends that the ALJ erred by finding that her previously disabling impairment of dilated cardiomyopathy had medically improved, such that her disability ceased in September 2003. In order to find that Plaintiff's condition had improved, the ALJ was required to compare original medical evidence and new medical evidence. See, e.g., Williams, 73 F. Supp. 2d at 1337.

Here, the ALJ found that there had been medical improvement in Plaintiff's cardiomyopathy impairment since the time of the most recent favorable decision. Section 4.04 of Appendix 1 references cardiac conditions and requires that the diagnosis be established by appropriate imaging techniques with evaluation of the severity cross-referred to other cardiac listings. See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.04. Specifically, the cardiac "Listings of Impairments" at Appendix 1 to Subpart P requires a ejection fraction ("EF") measured at 30% or less to meet the listings at Section 4.02(B) (Congestive Heart Failure), Section 4.04(B) (Ischemic Heart Disease) or Section 4.08

(Cardiomyopathies). Id. Listing 4.08 is the specific listing for cardiomyopathies in the Social Security Regulations. Id.

In the case sub judice, the ALJ stated as follows with regard to Plaintiff's medically improved cardiomyopathy:

> The record . . . establishes that the claimant was found disabled based upon a heart condition that, by echocardiogram testing, resulted in an ejection fraction of 15-20 percent, a finding consistent with Section 4.08 of Appendix 1, with reference to Section 4.04 and an ejection fraction of less than 30 per[cent]. Subsequent testing clearly established much greater ejection fractions, and improvement of left ventricular function, being reported by her attending cardiologist . . . . The claimant does not have an impairment that meets or medically equals any impairment listed in Appendix 1.
>
> The reports from Dr. Shaw, the echocardiogram results, and the reports form all other attending and examining sources show that substantial medical improvement has occurred. The consulting cardiologist noted a Class II impairment, which is consistent with light work as defined in the Social Security Administration Regulations. The ability to sustain light work establishes that the improvement is related to the ability to work.
>
> No exceptions to the medical improvement standard apply.
>
> The claimant continues to have cardiomyopathy which, although substantially improved as compared to the onset date, is severe . . . .
>
> The claimant . . . is found to be unable to return to any of her past jobs.
>
> The record includes an assessment of the claimant's residual functional capacity, completed by the state agency, which assesses her as capable of a full range of light work. That assessment is consistent with the medical record, and is hereby adopted by the Administrative Law Judge . . . . the claimant has no nonexertional limitations and no additional exertional limitations that would reduce her residual functional capacity for light work.
>
> . . . . she matches the criteria for Rule 202.17 . . . That Rule directs a finding that she is not disabled. Consequently, the Administrative Law Judge finds that the claimant's disability ceased in September, 2003, and her entitlement to benefits terminated at the end of November, 2003.
>
> In concluding that the claimant is no longer disabled, the Administrative Law Judge

> carefully considered her subjective allegations . . . .
>
> The claimant described daily activities that included doing her house work, taking care of her children, attending school activities and driving on occasion, all activities that are consistent with light work.
>
> The claimant testified that she had shortness of breath and swelling of her hands, feet, and ankles. However, the reports from her treating cardiologist show that she reported no shortness of breath, and none of the evidence refers to significant swelling.
>
> No specific precipitating or aggravating factors were described, and the record is void of reference to factors that precipitate or aggravate any symptoms in this case.
>
> The claimant takes medications prescribe[d] for her various diagnoses, and the record does not indicate any allegations of adverse effects of medications. The claimant did not testify to any adverse effects of any medication.
>
> The record does not reflect a history of any treatment, other than medication, used to control any of her symptoms.
>
> No other factors were described in the testimony, and none are apparent from the record.
>
> The claimant's allegations of continuing disability are not supported by her history of medical treatment and are not credible.

(Tr. 18-19). Thus, the ALJ concluded, through a comparison of the medical evidence, that there has been improvement in her cardiomyopathy, and that the medical improvement is related to her ability to work. (Id. at 19, Findings 5-6).

The evidence in the medical record supports the ALJ's finding. See, e.g., Whetstone, 263 F. Supp. 2d at 1322-1323; Allen v. Sullivan, 1992 WL 443576, *2-4 (N.D. Ala. Oct. 30, 1992). The relevant record reflects that while Plaintiff initially met the Listing 4.08 requirements, based on the fact that her February 2000 echocardiogram revealed left atrial enlargement and a left ventricular ejection fraction of 15-20%, Dr. Shaw's subsequent treatment notes from June 2000-January 2001 revealed that she was doing well, and had no shortness of breath or chest pain. See supra. Her

January 8, 2001 chest x-ray revealed a normal size heart; and on January 26, 2001, it was noted that her dilated cardiomyopathy had "pretty well compensated" on ACE inhibitors and beta blockers. (Tr. 330-333). Additionally, a June 22, 2001 echocardiogram revealed that she had a left ventricular ejection fraction of EF 30-35%, with a slight decrease in left ventricular size and slight improvement in overall left ventricular function. (Id. at 316). From October 2001-July 2003, Plaintiff, again, showed continued improvement, and had no chest pain, had decreased shortness of breath and had no edema. (Id. at 310-315). Dr. Shaw also noted that Plaintiff had a regular heart rate and regular heart rhythm, and that her dilated cardiomyopathy was "compensated." (Id. at 310). Dr. Rinher evaluated Plaintiff on July 28, 2003, at which time – after reviewing her June 22, 2001 echocardiogram – he concluded that her symptoms were consistent with Class II New York Heart Association congestive heart failure and recommended an echocardiogram. (Id. at 299). He opined that Plaintiff might be able to perform some sedentary work. (Id.) Plaintiff had an echocardiogram on September 2, 2003, which demonstrated continued improvement in her cardiomyopathy, an ejection fraction of EF 40-45%, and a normal or only mildly increased left ventricle size. (Tr. 309). On September 5, 2003, a State Agency medical consultant completed a Residual Functional Capacity Assessment, wherein he concluded that Plaintiff could occasionally lift 20 pounds; could frequently lift 10 pounds; could stand/walk about 6 hours per 8 hour work day; and could sit about 6 hours per 8 hour work day. (Id. at 300-307). Furthermore, on November 18, 2003, Dr. Shaw concluded that Plaintiff's ventricular function had improved with an ejection fraction of 40-45%, that she had more energy, that she had begun exercising, that she had good blood pressure readings for her last assessment, and that her dilated cardiomyopathy was improved and well compensated. (Id. at 308). In short, these records indicate that Plaintiff's cardiomyopathy has steadily improved,

such that she no longer meets the requirements of Listing 4.08 (requiring an EF 30% or less).

Furthermore, Plaintiff's additional claim, that the ALJ ignored her subjective symptoms and pain allegations, fails. Not only did the ALJ specifically state in his decision that he had considered Plaintiff's subjective complaints, (Tr. 18), but the record also reveals that her statements and self-reporting do not dictate a different finding, particularly given that Listing 4.08 requires a clinical ejection fraction finding as opposed to subjective allegations. Moreover, as noted by the ALJ in his decision, Plaintiff described performing activities of daily living that were consistent with light work, and her testimony was contradicted by her physical examinations. (Tr. 18-19). Additionally, there was no evidence of precipitating or aggravating factors, nor did Plaintiff testify that she suffered from any adverse side effects from her medication (which was the only treatment used to control her symptoms). (Id.) Plus, her allegations were not supported by her history of medical treatment. (Id.) Thus, they were not credible. (Id. at 19). Accordingly, the ALJ properly concluded that Plaintiff's cardiomyopathy, while a severe impairment, had reached "medical improvement," that such improvement was related to her ability to work, that she no longer met the relevant Listing, and that as a result, she is not disabled. See, e.g., Williams, 73 F. Supp. 2d at 1325; Whetstone, 263 F. Supp. 2d at 1318.

## V. Conclusion

For the reasons set forth, and upon careful consideration of the administrative record, oral argument and memoranda of the parties, it is hereby **RECOMMENDED** that the decision of the Commissioner of Social Security, denying Plaintiff's claim for disability insurance benefits and supplemental security income, be **AFFIRMED.**

The attached sheet contains important information regarding objections to this <u>Report and Recommendation</u>.

**DONE** this **25th** day of **April, 2007.**

                                              <u>      /s/SONJA F. BIVINS          </u>
                                              **UNITED STATES MAGISTRATE JUDGE**

## MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS AND RESPONSIBILITIES FOLLOWING RECOMMENDATION AND FINDINGS CONCERNING NEED FOR TRANSCRIPT

1. **Objection**. Any party who objects to this recommendation or anything in it must, within ten days of the date of service of this document, file specific written objections with the clerk of court. Failure to do so will bar a *de novo* determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the magistrate judge. See 28 U.S.C. § 636(b)(1)(c); Lewis v. Smith, 855 F.2d 736, 738 (11th Cir. 1988). The procedure for challenging the findings and recommendations of the magistrate judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides, in part, that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten days after being served with a copy of the recommendation, unless a different time is established by order. The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection. The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made. It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection. Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2. **Opposing party's response to the objection.** Any opposing party may submit a brief opposing the objection within ten (10) days of being served with a copy of the statement of objection. Fed. R. Civ. P. 72; SD ALA LR 72.4(b).

3. **Transcript (applicable where proceedings tape recorded)**. Pursuant to 28 U.S.C. § 1915 and Fed.R.Civ.P. 72(b), the magistrate judge finds that the tapes and original records in this action are adequate for purposes of review. Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.

                                               **/s/SONJA F. BIVINS**
                                            **UNITED STATES MAGISTRATE JUDGE**